UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-----------------------------------------------------------------X
                                                                 :
UNITED STATES OF AMERICA                                         :
                                                                 :
                    - v. –                                       :
                                                                 :        18 Cr. 217 (KMW)
                                                                 :
GORDON FREEDMAN,                                                 :
                                                                 :
                    Defendant.                                   :
                                                                 :
-----------------------------------------------------------------X


### THE GOVERNMENT'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANT'S MOTIONS *IN LIMINE*

GEOFFREY S. BERMAN
United States Attorney for the
Southern District of New York
Attorney for the United States
     of America




Noah Solowiejczyk
David Abramowicz
Katherine Reilly
Assistant United States Attorneys
     - Of Counsel -

## **TABLE OF CONTENTS**

PRELIMINARY STATEMENT .................................................................................................... 1

DISCUSSION ........................................................................................................................... 1

I.      THE GOVERNMENT DOES NOT INTEND TO INTRODUCE EVIDENCE OF
        INSYS'S GUILTY PLEA, DEFERRED PROSECUTION AGREEMENT, OR CIVIL
        SETTLEMENT. .................................................................................................................. 1

II.     THE GOVERNMENT DOES NOT INTEND TO ARGUE THAT THE DEFENDANT
        IS AKIN TO A "STREET-LEVEL" DRUG DEALER, NOR TO COMPARE SUBSYS
        TO HEROIN OR OTHER "STREET DRUGS." ............................................................... 2

III.    THE GOVERNMENT DOES NOT INTEND TO ALLEGE AN AFFIRMATIVE DUTY
        OF DISCLOSURE REGARDING PAYMENTS FROM INSYS, BUT WILL
        PROPERLY ELICIT RELEVANT INFORMATION ABOUT WHAT WAS
        DISCLOSED TO PATIENTS AND OTHERS REGARDING FREEDMAN'S
        RELATIONSHIP WITH INSYS. ....................................................................................... 3

IV.     THE DEFENDANT'S MOTION TO PRECLUDE EVIDENCE THAT INSYS
        REIMBURSEMENT CENTER EMPLOYEES LIED TO INSURERS IN ORDER TO
        OBTAIN COVERAGE FOR SUBSYS PRESCRIPTIONS SHOULD BE DENIED. ...... 6

V.      THE DEFENDANT'S MOTION TO AMEND THE INDICTMENT SHOULD BE
        DENIED. ............................................................................................................................. 8

CONCLUSION ........................................................................................................................ 11

## PRELIMINARY STATEMENT

The Government respectfully submits this memorandum of law in opposition to the motions *in limine* filed by Gordon Freedman, the defendant (the "defendant" or "Freedman"), in advance of trial in this matter, which is scheduled to begin on November 4, 2019. As set forth below, several of the defendant's motions seek to preclude evidence or argument the Government does not intend to offer; these should be denied as moot. The remaining motions—in particular, the defendant's motion to preclude argument—are without merit and should also be denied.

## DISCUSSION

**I.   THE GOVERNMENT DOES NOT INTEND TO INTRODUCE EVIDENCE OF INSYS'S GUILTY PLEA, DEFERRED PROSECUTION AGREEMENT, OR CIVIL SETTLEMENT.**

The charges in this case stem from the defendant's acceptance of bribe and kickback payments from Insys Therapeutics, Inc. ("Insys"), in exchange for prescribing Insys's fentanyl-based spray, Subsys, to his patients. In June of this year, Insys Pharma, Inc., a subsidiary of Insys, pleaded guilty in the District of Massachusetts to five counts of mail fraud and entered into a deferred prosecution agreement and a civil settlement with the United States Attorney's Office for the District of Massachusetts. The defendant moves to preclude the Government from introducing "evidence, testimony and argument" related to these resolutions. (Def. Ltr. Br. at 2-5). The Government does not intend to introduce any such evidence, nor to refer to Insys's

corporate resolution in argument.[1]  Accordingly, the defendant's motion is moot.

## II.   THE GOVERNMENT DOES NOT INTEND TO ARGUE THAT THE DEFENDANT IS AKIN TO A "STREET-LEVEL" DRUG DEALER, NOR TO COMPARE SUBSYS TO HEROIN OR OTHER "STREET DRUGS."

The defendant also moves to preclude the Government from "irrelevant, highly inflammatory and unfairly prejudicial references to an 'opioid crisis' or 'opioid epidemic,' comparisons of Subsys to heroin or street drugs, and references to the physician defendants and/or Insys personnel as drug dealers."  (Def. Ltr. Br. at 5-9).

The Government has no intention of arguing or eliciting testimony to the effect that the defendant or others at Insys are akin to drug dealers, nor that Subsys is like heroin or another "street drug."  With that said, as the defendant previews (Def. Ltr. Br. at 6), the Government does plan to introduce evidence about the properties of Subsys, including its equivalence to morphine, which is commonly used, including by the Centers for Disease Control, to measure the relative strength of different opioids.  The Government also intends to call an expert in the field of pain medicine who will testify about, among other things, uses of oxycodone, anti-diversion practices, factors in deciding whether and in what quantities to prescribe opioids, and the properties of fentanyl, generally, and Subsys, specifically.  This expert will, necessarily, offer testimony that compares various narcotics and puts the usage of those narcotics in context.  In particular, this testimony will relate to whether Freedman's prescribing of Subsys to certain patients, given the combination of opioids already being prescribed to the patient, was supported by a reasonable medical rationale.  This expert testimony will also cover certain accepted

---

[1]  The Government does intend to introduce evidence and to elicit testimony related to the disposition of charges against former Insys executives or employees who testify at trial as cooperating witnesses.  The Government does not understand the defendant to be objecting to or seeking preclusion of such evidence and related argument.

standards of care with respect to opioid prescribing during the time period relevant to the Indictment.  As a result, the testimony will include discussion of the risks and dangers of using opioids, including the potential for addition.  Such testimony, however, will not in any way involve comparing the defendant to a drug dealer, calling Subsys a "street drug," or specifically make reference to the "opioid epidemic."

Similarly, the Government intends to call one or more patients of the defendant, who will likely testify about the effects of Subsys, their use of Subsys in connection with, or instead of, other medications, and their reasons for seeking treatment from the defendant.  This testimony may also include discussion of the addictive properties of some of these medications and the resulting effects on the patients.

The Government submits that the testimony of both the expert and the patients will not be "irrelevant," nor "highly inflammatory," but will, instead, provide relevant evidence about the defendant's prescribing and other medical practices and the impacts and uses of Subsys.  Indeed, the Government intends to avoid eliciting any inflammatory testimony or argument along the lines that the defendant's motion appears directed at.

III.    **THE GOVERNMENT DOES NOT INTEND TO ALLEGE AN AFFIRMATIVE DUTY OF DISCLOSURE REGARDING PAYMENTS FROM INSYS, BUT WILL PROPERLY ELICIT RELEVANT INFORMATION ABOUT WHAT WAS DISCLOSED TO PATIENTS AND OTHERS REGARDING FREEDMAN'S RELATIONSHIP WITH INSYS.**

The defendant seeks to preclude the Government from alleging that he had an affirmative duty to disclose to any patients to whom he prescribed Subsys that he was being paid by Insys— the manufacturer of Subsys—for participating in the company's speaker program.  (Def. Ltr. Br. at 9-11).  Of course, the Government is alleging that the defendant was paid not for participating in Insys's speakers program but as a *quid pro quo* for prescribing Subsys; as alleged in the

Indictment, the speakers program was a sham, used primarily as a vehicle to pay doctors in exchange for their prescribing Subsys.  (*See, e.g.,* Indictment ¶¶ 3-5).  The defendant is alleged to have conspired to commit honest services wire fraud by accepting bribes and kickbacks, which "thereby depriv[ed] patients of their intangible rights to their doctors' honest services." (*Id.* at ¶ 158).  Nevertheless, the Government will not argue that Freedman had an affirmative obligation to disclose to his patients the fact he was receiving Speaker Program fees from Insys. As a result, the defendant's motion should be denied as moot.

The Government does, however, intend to elicit from witnesses—including patients of Freedman's—that the defendant did not, in fact, disclose that he was being paid by Insys when prescribing them Subsys.  The defendant's decision not to share this information with his patients at the time he was informing them he believed Subsys was necessary for their treatment – regardless of the fact that he may not have been legally obliged to do so –  is directly relevant to essential elements of the charged offenses.  *See United States v. Litvak*, 889 F.3d 56, 68 (2d Cir. 2018) (noting that relevancy is a "very low standard" and that evidence "need not be sufficient by itself to prove a fact in issue, much less to prove it beyond a reasonable doubt," in order to be relevant) (internal quotations omitted).

In particular, the defendant is charged in Count Three with conspiring to commit honest services wire fraud, in violation of Title 18, United States Code, Section 1349.  An element of that offense is the existence of a "scheme or artifice to defraud," which is defined as "a plan to deprive another of…the intangible right to honest services[] by trick, deceit, deception or swindle."  2-71 Modern Federal Jury Instructions-Criminal, ¶ 44.01 (Matthew Bender 2019). Such a scheme might include "fraudulent half truths or omissions of material facts[.]"  *Id.* Moreover, at trial the Government must prove that the scheme or artifice to defraud involved a

material misrepresentation, false statement, false pretense, or omission. *See United States v. Rybicki,* 354 F.3d 124, 145 (2d Cir. 2003) (en banc) ("the misrepresentation or omission at issue for an honest services fraud conviction must be 'material,' such that the misinformation or omission would naturally tend to lead or is capable of leading a reasonable employer to change its conduct.").

Here, the Government alleges that Freedman deprived his patients of their intangible rights to his honest services by prescribing Subsys in return for payments from Insys and, relatedly, that the fact of his receiving these *quid pro quo* payments was material to those patients. (Indictment ¶ 158). Freedman's decision to omit from his discussions with his patients any mention of the payments he received from Subsys's manufacturer is directly relevant to the existence of a scheme to defraud those patients. The Government does not intend to argue that the mere fact that Freedman did not disclose the payments to his patients is, in and of itself, sufficient evidence to meet any of the requisite elements of honest services wire fraud. But that is not the question. The question is what is *relevant*. That Freedman did not inform his patients that he was being paid thousands of dollars per Speaker Program by Insys's manufacturer at the time he chose to prescribe Subsys to them is plainly relevant to whether a scheme or artifice to defraud existed. Indeed, if the defendant elicited testimony from patients that the defendant in fact did inform his patients that he was being paid handsome sums by Subsys's manufacturer when he prescribed the drug to those patients, there would be no question that such evidence would be relevant. The inverse is true as well, regardless of the defendant's legal duties.

Separately, Freedman's decision not to tell patients about the payments he received from Insys—the manufacturer of a drug he frequently prescribed—is relevant to his state of mind and his intent; the jury could infer that Freedman determined not to disclose those payments because

5

of their criminal purpose.  Of course, the defendant may argue that Freedman was under no

obligation to disclose the payments or, perhaps, that he took no affirmative steps to conceal

them.  The jury, then, can assess the evidence regarding what patients were told for themselves,

as they should in their proper role as finders of fact.[2]

## IV.   THE DEFENDANT'S MOTION TO PRECLUDE EVIDENCE THAT INSYS REIMBURSEMENT CENTER EMPLOYEES LIED TO INSURERS IN ORDER TO OBTAIN COVERAGE FOR SUBSYS PRESCRIPTIONS SHOULD BE DENIED.

The defendant moves to preclude evidence that Insys employees working in the Insys

Reimbursement Center ("IRC") lied to insurance companies in order to obtain insurance

coverage for prescriptions of Subsys, arguing that such evidence is "irrelevant" absent evidence

that "Freedman aided or even had knowledge of the alleged actions by IRC employees to

---

[2]  As the Government noted in opposing the motions to dismiss filed in this case, during much of the period at issue in the Indictment, the Centers for Medicare and Medicaid Services maintained a publicly available database of payments from pharmaceutical companies to doctors, which included the fees paid to the defendant by Insys. In seeking to preclude discussion of any affirmative obligation to disclose, the defendant points to the public disclosure of these payments. (Def. Ltr. Br. at 10).  It bears noting, however, that the public disclosure of these payments only went into effect in or about late 2013, almost a year after the defendant began receiving Speaker Program fees from Insys.  Thus, there was no way for patients to learn of these payments during the 2012 to 2013 period.  In addition, the fact the information was publicly available does not mean that patients were aware of the availability of this data, nor of the payments themselves.  The Government should be able to elicit from any patients who testify whether they, in fact, knew of the payments.  Moreover, the defendant's focus on the publicly available data is misplaced.  The  heart of the information that the Government argues was concealed from patients – namely, that fees were being paid to the defendant in exchange for him prescribing Subsys to his patients, in breach of his duties to those patients—is, of course, nowhere in any public database.  Instead, the publicly available database mischaracterized these payments as "[c]ompensation for services other than consulting, including serving as faculty or as a speaker at a venue other than a continuing education program."  *See* "Natures of Payment," *available at* https://www.cms.gov/OpenPayments/About/Natures-of-Payment.html (last visited Oct. 10, 2019).  As alleged in the Indictment, the payments were not for providing a bona fide educational service (because the Speaker Programs were largely shams), but rather were bribes and kickbacks for prescribing Subsys.  Accordingly, the fact the payments were disclosed publicly is, ultimately, neither here nor there.

improperly obtain insurance coverage for Subsys prescriptions." (Def. Ltr. Br. at 11-12). The Government does not intend to introduce evidence of fraudulent conduct IRC employees engaged in without Freedman's participation or knowledge. Accordingly, the defendant's motion should be denied as moot.

As set forth in the Government's motions *in limine*, the Government intends to introduce certain communications Insys employees had regarding insurance coverage. (*See* Dkt. 155, at 12). That evidence will show, among other things, that Insys employees working on-site at the defendant's office routinely transmitted information about Freedman's patients to the IRC, a separate department within Insys dedicated to obtaining coverage for Subsys prescriptions from insurance companies; interacted with staff at the IRC and at pharmacies to ensure prescriptions were covered by insurance and filled; and communicated internally and with staff from Freedman's office about steps necessary to obtain insurance coverage, such as to request patient-specific information required by an insurer. (*See id.*). Such evidence is relevant to explain how the conspiracy operated and provide context for testimony about Insys employees' frequent presence in Freedman's medical office. The Government does not intend, however, to present evidence that IRC employees manipulated the information the IRC obtained from Freedman's practice or otherwise commit fraud without Freedman's knowledge. By way of example, the fact that IRC employees lied on telephone calls to insurance companies regarding whether certain patients had active cancer diagnoses is not an area the Government plans to explore at trial.

By contrast, any evidence that Freedman himself deceived or knew others were deceiving insurers in order to obtain approval for Subsys prescriptions is admissible and highly relevant to the charged conspiracy. For example, any evidence that Freedman, in order to obtain insurance coverage for Subsys, made false or misleading statements about a patient's condition in patient

7

notes, wrote or signed a misleading letter of medical necessity that was provided to an insurer, or approved an opt-in form that reported false information about a patient Freedman and Insys wanted to be pre-authorized by an insurer to receive Subsys, should not be precluded.  Efforts to mislead insurers into covering Subsys prescriptions would plainly be relevant to proving that Freedman entered into an unlawful agreement to help Insys profit from his Subsys prescriptions, to include going so far as providing false information about these patients' conditions in order to ensure that the insurance company approved the prescription and Insys profited.

## V.    THE DEFENDANT'S MOTION TO AMEND THE INDICTMENT SHOULD BE DENIED.

The Indictment describes in detail a March 29, 2013 e-mail exchange between an Insys Regional Sales Manager (referred to the Indictment and herein as "RSM-2") and Freedman (the "March 29 E-mails").  (Indictment ¶¶ 51-52).   As set forth in the Indictment, RSM-2 "informed" Freedman in that e-mail that Insys "was increasing the number of Speaker Programs allocated to FREEDMAN for the second quarter of 2013, and that FREEDMAN was scheduled to conduct approximately 11 Speaker Programs in April and May alone."  (*Id.* ¶ 51).  The Indictment further alleges that "RSM-2 explained that FREEDMAN had been allocated additional Speaker Programs because Pharma Company-1 wanted prescriptions of the Fentanyl Spray to increase in the second quarter of 2013[.]"  (*Id.*).   The Indictment quotes RSM-2's e-mail to Freedman, nothing that RSM-2 wrote, in part:

> FYI the reason I was able to grab the extra budget allocation is they wanted us to push for a QUICK start in April with new activations for "Executive Board" reasons in Q2. So please do continue looking in that direction. I don't care if ultimately a few of those are not able to get approved and we wind up using the guarantee.  Really!

> Like I said I'd rather you put 20 (or more, of course, LOL) new patients (commercially insured of course, as always) on it in April

8

> and even if we wind up only getting 10-14 approved, rather than only have you go with the safe 6-7 that you think will all get approved. It is still a winning proposition. THANKS! See you next week!

(*Id.*)  The Indictment further alleges that Freedman "responded to the above-referenced e-mail, in part, 'Got it,' and he confirmed the dates of the upcoming Speaker Programs."  (*Id.* ¶ 52.).  That description of the defendant's response to the email is entirely consistent with the text of the email itself.  Nevertheless, the defendant seeks to have this Court order the Government to amend the version of the Indictment provided to the jury during deliberations, "to include the full context of these emails." (Def. Ltr. Br. at 13).

Generally speaking, "a court may not alter or amend the indictment, literally or constructively, once it has been returned by the grand jury."  *United States v. McCourty*, 562 F.3d 458, 470 (2d Cir. 2009).   An indictment may be amended, however, to address "the correction of merely technical errors, such as typographical or clerical mistakes" where the amendment "does not alter the essential substance of the charging terms."  *United States v. Miller*, 116 F.3d 641, 669-670 (2d Cir. 1996).  Here, without citation to any legal authority or relevant rule of procedure or evidence, the defendant seeks amendment not because he has identified such a "typographical or clerical mistake," but because he takes issue with the description of the March 29 E-mails in the Indictment, arguing that the Indictment omits information that "makes clear" that the "crux" of the defendant's response "was to confirm the dates of the speaker engagements, and not that Dr. Freedman was agreeing to violate anti-kickback laws." (Def. Ltr. Br. at 13).  To the contrary, the description of the March 29 E-mails contained in the Indictment is accurate and requires no amendment.  Despite the defendant's complaints, the Indictment makes clear that the March 29 E-mails discuss the "approximately 11

Speaker Programs" allocated to Freedman "in April and May alone" and explicitly notes that Freedman's response "confirmed the dates of the upcoming Speakers Program." (Indictment ¶¶ 51-52). That the defendant has a different interpretation of the meaning of his response to the email than the Government is by no means surprising but is, at bottom, an argument for the jury.

Even if the defendant does take issue with the discussion of the March 29 E-mails in the Indictment, courts typically instruct juries that indictments are merely allegations, and not in and of themselves evidence. *See* 2-71 Modern Federal Jury Instructions-Criminal, ¶ 3.01 (setting forth the model jury instruction on the "Indictment and Charges," which notes that "an indictment is merely a statement of charges and not itself evidence"). The March 29 E-mails will surely be introduced into evidence at trial and will thus be available in their entirety to the jury during deliberations. The defendant will no doubt argue to the jury that the March 29 E-mails do not establish the defendant's agreement to the charged kickback scheme. His contention on the instant motion that the discussion of dates in the March 29 E-mails is the "crux" of the exchange is part and parcel of this argument. But it is also properly the province of argument and not of an amendment to the Indictment. To amend the Indictment to include the full text of the March 29 E-mails is, thus, both unnecessary and inappropriate, and the defendant's motion to do so should be denied.

10

## **CONCLUSION**

For the reasons set forth above, the Government respectfully submits that the defendant's

motions *in limine* should be denied.


Dated:  New York, New York
        October 11, 2019

                                    Respectfully submitted,

                                    GEOFFREY S. BERMAN
                                    United States Attorney
                                    for the Southern District of New York

                        By:     _____/s/_____
                                    Noah Solowiejczyk
                                    David Abramowicz
                                    Katherine Reilly
                                    Assistant United States Attorneys
                                    Tel.: (212) 637-2473/6525/6521